**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

O'MELVENY & MYERS LLP
Shannon Lowry Nagle
Jason R. Alderson
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2176

Attorneys for the Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **2008 Asset Holding Corp.,** | : | **Case No. 09-14264 (AJG)** |
| **2008 Asset Holding - TRS Corp.,** | : | **Case No. 09-14265 (AJG)** |
| **2008 Asset Holding - QRSRE Corp.,** | : | **Case No. 09-14266 (AJG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------------------- x

**AMENDED DISCLOSURE STATEMENT WITH RESPECT TO**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION OF**
**2008 ASSET HOLDING CORP. AND ITS AFFILIATE DEBTORS**

THE DEBTORS BELIEVE THAT THE PLAN WILL MAXIMIZE THE RECOVERY FOR THEIR CREDITORS AND ALL PARTIES IN INTEREST, ENABLE THE DEBTORS TO PROMPTLY LIQUIDATE, AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS, AND THEREFORE URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. PREVAILING EASTERN TIME ON [NOVEMBER 6, 2009], UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY COUNSEL FOR THE DEBTORS ON OR BEFORE THE VOTING DEADLINE.

THIS DISCLOSURE STATEMENT, THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF 2008 ASSET HOLDING CORP. AND ITS AFFILIATE DEBTORS (WHICH IS ANNEXED HERETO AS EXHIBIT 1), THE OTHER EXHIBITS ANNEXED HERETO, THE ACCOMPANYING BALLOTS AND THE RELATED MATERIALS DELIVERED TOGETHER HEREWITH ARE BEING FURNISHED BY THE DEBTORS TO RECORD HOLDERS OF IMPAIRED GENERAL UNSECURED CLAIMS KNOWN TO THE DEBTORS IN CONNECTION WITH THE SOLICITATION BY THE DEBTORS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE SUMMARIES OF THE PLAN IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

IF THE DEBTORS RECEIVE PROPERLY COMPLETED BALLOTS INDICATING ACCEPTANCE OF THE PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS PRESCRIBED BY SECTION 1126 OF THE BANKRUPTCY CODE, THEY INTEND TO SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PLAN. CONSUMMATION OF THE PLAN IS EXPECTED TO OCCUR SHORTLY FOLLOWING THE BANKRUPTCY COURT'S ENTRY OF AN ORDER CONFIRMING THE PLAN (THE "CONFIRMATION ORDER").

ARTICLE I      DEFINED TERMS AND RULES OF INTERPRETATION ..........................1

     A.      Defined Terms ........................................................................1

     B.      Rules of Interpretation and Computation of Time.....................1

ARTICLE II      INTRODUCTION .............................................................2

     A.      General......................................................................2

     B.      The Solicitation..........................................................2

     C.      The Confirmation Hearing..............................................3

     D.      Voting; Holders of Claims Entitled to Vote .........................3

     E.      Important Matters ......................................................4

ARTICLE III      SUMMARY OF PLAN AND CLASSIFICATION AND
           TREATMENT OF CLAIMS AND INTERESTS THEREUNDER .................5

ARTICLE IV      BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11..............6

     A.      The Debtors' Businesses................................................6

     B.      Corporate History and Structure .....................................7

     C.      Management of the Debtors............................................7

     D.      Summary of Prepetition Indebtedness ...............................8

     E.      Summary of Investment Portfolio and Assets .......................9

     F.      Events Leading to the Commencement of these Chapter 11 Cases.....................10

ARTICLE V      REASONS FOR THE SOLICITATION; RECOMMENDATION ...............11

ARTICLE VI      THE PLAN ...............................................................11

     A.      Overview of Chapter 11................................................11

     B.      Overview of the Plan ..................................................12

     C.      Unclassified Claims ...................................................13

     D.      Description of the Classes ............................................14

     E.      Other Provisions of the Plan .........................................15

     F.      Conditions Precedent to the Effective Date.........................24

     G.      Effect of Confirmation................................................25

     H.      Retention of Jurisdiction..............................................26

     I.      Bar Dates for Administrative Claims .................................27

     J.      Modifications and Amendments.........................................28

     K.      Plan Revocation, Withdrawal or Non-Consummation ...................28

     L.      Cobalt Litigation.....................................................28

     M.      Preservation of Causes of Action ....................................28

N.   Corporate Dissolution ................................................................................29

O.   Dissolution and Rights of Creditors' Committee .................................29

P.   Entry of a Final Decree ...............................................................................29

Q.   Nondischarge of the Debtors .....................................................................30

R.   Fees and Expenses .......................................................................................30

ARTICLE VII   CONFIRMATION OF THE PLAN OF LIQUIDATION ..............30

A.   Confirmation Hearing .................................................................................30

B.   Confirmation..................................................................................................31

C.   Classification of Claims and Interests ......................................................34

D.   Consummation...............................................................................................34

ARTICLE VIII   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN ...............................................................................34

A.   Liquidation Under Chapter 7 .....................................................................34

B.   Alternative Plan(s) of Liquidation ............................................................34

C.   Dismissal of the Debtors' Chapter 11 Cases ...........................................35

ARTICLE IX   SUMMARY OF VOTING PROCEDURES .....................................35

ARTICLE X   CERTAIN FACTORS TO BE CONSIDERED .............................36

A.   Certain Bankruptcy Considerations.........................................................36

B.   Risks Relating to Tax and Accounting Consequences of the Plan........37

ARTICLE XI   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN...............................................................................................37

A.   Federal Income Tax Consequences to the Debtors.................................37

B.   Federal Income Tax Consequences to Holders of Certain Claims .......39

ARTICLE XII   CONCLUSION...............................................................................41

# ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**A.     Defined Terms.**  Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan, Bankruptcy Code or the Bankruptcy Rules, as applicable.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**B.     Rules of Interpretation and Computation of Time.**  For purposes of this Disclosure Statement, unless otherwise provided herein:

1.     *Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, includes both the singular and the plural;*

2.     *Unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;*

3.     *Any reference in the Plan to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan;*

4.     *Any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;*

5.     *All references in the Plan to sections, articles and schedules are references to sections, articles, and schedules of the Plan;*

6.     *The words "herein," "hereunder" and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement;*

7.     *Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;*

8.     *Subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules;*

9.     *The rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan; and*

10.    *In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.*

# ARTICLE II
## INTRODUCTION

### A.     General

2008 AHC, QRS and TRS (collectively, the "Debtors") hereby transmit this Disclosure Statement (as it may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement") pursuant to section 1125(b) of the Bankruptcy Code, for use in the solicitation of votes (the "Solicitation") to accept the Joint Chapter 11 Plan of Liquidation of 2008 AHC and its Affiliate Debtors dated as of September 9, 2009 (the "Plan," a copy of which is attached to this Disclosure Statement as Exhibit 1).  The Solicitation is being conducted at this time to obtain sufficient acceptances to enable the Plan to be confirmed by the Bankruptcy Court pursuant to the provisions of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Consolidated financial statements (unaudited) for the Debtors as of June 30, 2009 (Exhibit 2);

- The Debtors' Liquidation Analysis (Exhibit 3);

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the office of the Debtors' counsel, at O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036, Attention:  Shannon Lowry Nagle, Esq., (212) 326-2000 (phone) or (212) 326-2061 (facsimile).

In addition, a Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the Holders of Claims that are entitled to vote to accept or reject the Plan.  If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Debtors' counsel, at O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036, Attention:  Shannon Lowry Nagle, Esq., (212) 326-2000 (phone) or (212) 326-2061 (facsimile).

Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

### B.     The Solicitation

At this time, the Debtors are soliciting acceptances of the Plan from the Holders of Class 2 Claims.  Holder of Class 3 Claims and Interests will not receive any recovery and are deemed to have rejected the Plan.  If sufficient votes for acceptance of the Plan are received, the Debtors expect to promptly seek confirmation of the Plan.  If the Debtors do not receive the Requisite Acceptances (defined

below) by the Voting Deadline, they will be forced to evaluate other available options, including seeking confirmation of the Plan as a cramdown plan pursuant to section 1129(b) of the Bankruptcy Code.

## C.     **The Confirmation Hearing**

If the Debtors receive the Requisite Acceptances with respect to the Plan, the Debtors intend to request that the Bankruptcy Court schedule a Confirmation Hearing as soon as possible, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(a) of the Bankruptcy Code, and they have reserved the right to modify the plan to the extent, if any, that confirmation pursuant to section 1129(a) of the Bankruptcy Code requires modification.

## D.     **Voting; Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or Interests that are Impaired and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject a proposed plan. Generally, a Claim or Interest is Impaired under a plan if the Holder's legal, equitable or contractual rights are altered under such plan. Classes of Claims or Interests under a chapter 11 plan in which the Holders of Claims or Interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. In addition, Classes of Claims or Interests in which the Holders of Claims or Interests will not receive or retain any property are deemed to have rejected the chapter 11 plan and are not entitled to vote to accept or reject the chapter 11 plan.

In connection with the Plan:

- Holders of Claims in Class 2 are impaired and the Holders of such Claims will receive distributions under the Plan. As a result, Holders of Claims in this Class are entitled to vote to accept or reject the Plan;

- Holders of Claims and Interests in Class 3 will not receive or retain any property under the Plan, and the Existing Equity Holders and Holders of Cobalt Litigation Claims in this Class are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims or Interests as acceptance by creditors in that Class that hold at least two-thirds in dollar amount and more than one-half in number of the Claims that cast ballots for acceptance or rejection of the Plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each Class that is Impaired and entitled to vote under a chapter 11 plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are employed.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more Impaired Classes of Claims or Interests, so long as at least one Impaired Class of Claims or Interests votes to accept the chapter 11 plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete, execute and return your Ballot(s) to the Debtors' counsel at the address below:

> O'Melveny & Myers LLP
> Times Square Tower
> 7 Times Square
> New York, NY 10036
> Attn: Shannon Lowry Nagle

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY COUNSEL FOR THE DEBTORS NO LATER THAN 5:00 PM, PREVAILING EASTERN TIME, ON [NOVEMBER 6, 2009], UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER, MESSENGER OR FACSIMILE. ALL BALLOTS MUST BE SIGNED IN ORDER TO BE COUNTED.

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call Shannon Lowry Nagle at (212) 326-2000.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement.

The Bankruptcy Court has fixed 5:00 p.m., prevailing Eastern Time, on [October 7, 2009] (the "Voting Record Date") as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept the Plan. Accordingly, only Holders of record as of [October 7, 2009] that are otherwise entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether each voting Class of Impaired Claims has accepted the Plan. Counsel for the Debtors will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan on a Class-by-Class basis with respect to the Classes entitled to vote.

## E.     <u>Important Matters</u>

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the Exhibits annexed hereto are therefore not necessarily indicative of future financial results of the Debtors, which in each case may vary

significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors, or any Person that the projected financial results can or will be achieved.

## ARTICLE III
## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

The overall purpose of the Plan is to provide for the wind down and efficient liquidation of the Debtors in a manner designed to maximize the recovery to all stakeholders. Generally, the Plan provides for the transfer to each Holder of an Allowed General Unsecured Claim, in full satisfaction of such Claim, of a Pro Rata share of Excess Cash. Existing Equity Holders and Holders of Cobalt Litigation Claims will not receive a distribution under the Plan.

The following table differentiates between the Claims against, and Interests in, the Debtors and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on rules set forth in the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. **The recoveries and estimates described in the following tables represent the Debtors' best estimates given the information available on the date of this Disclosure Statement. All statements in this section to the amount of Claims are only estimates based on information known to the Debtors at the date hereof, and the final amounts of Claims Allowed by the Bankruptcy Court may vary significantly from these estimates.**

In connection with preparing the estimation of recoveries set forth herein, the following assumptions were made:

- The aggregate Allowed amount of Administrative Claims (Claims for postpetition expenses of the Debtors and Professional Fees) will be approximately $670,000.00.

- The aggregate Allowed amount of Tax Claims will be approximately $603,000.00.

- The aggregate Allowed amount of General Unsecured Claims will be approximately $112 million.

The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims have not been classified.

| Class | Description | Treatment | Impaired | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|----------|------------------|--------------------------------------------------|--------------------|
| Unclassified | Administrative Claims | Each Holder of an Allowed Administrative Claim shall receive, at the Debtors' option, either (a) Cash in an amount equal to the Allowed amount of such Claim, (b) upon such other terms as may exist in the ordinary course of such Debtors' business; or (c) upon such other terms as may | No | No | $670,000.00 | 100% |

| | | be agreed upon between the Holder of such Administrative Claim and the Debtors. | | | | |
|---|---|---|---|---|---|---|
| Unclassified | Tax Claims | Each Holder of an Allowed Tax Claim shall receive, at the Debtors' option, either (a) Cash in an amount equal to the Allowed amount of such Claim (b) such other less favorable treatment as to which such Holder and the applicable Debtor agree or (c) such other treatment such that the Claim will not be Impaired. | No | No | $603,000.00 | 100% |
| Class 1 | Secured Claims | The Debtors do not have any Allowed Secured Claims | n/a | n/a | None | n/a |
| Class 2 | General Unsecured Claims | Each Holder of an Allowed Claim in Class 1 shall receive a Pro Rata share of Excess Cash. | Yes | Yes | $112 million | 1-2% |
| Class 3 | Existing Equity Holders and Holders of Cobalt Litigation Claims | Existing Equity Holders' Interests are cancelled under the Plan. Pursuant to Section 510(b) of the Bankruptcy Code, the Claims relating to the Cobalt Litigation are subordinated and classified with Existing Equity Holders. | Yes | No, deemed to have rejected the Plan. | NA | 0% |

The recoveries set forth above are estimates that are contingent upon, among other things, approval of the Plan as proposed.

## ARTICLE IV
## BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11

### A.    The Debtors' Businesses

*1.    Description of Debtors' Businesses.*

2008 AHC is a specialty finance company created to invest in real estate-related securities, real estate loans and instruments and various other asset classes. 2008 AHC is qualified as a Real Estate Investment Trust (a "REIT") for federal income tax purposes. 2008 AHC is externally managed and advised by GSCP (NJ), L.P., an SEC-registered investment advisor (the "Manager"). Although not active in the last year, the following briefly describes the Debtors' historical five main investment categories:

- Real estate-related securities, principally agency backed, or agency and non-agency backed, or private label, prime and sub-prime residential mortgage backed securities, including commercial mortgage-backed securities, either directly or indirectly through credit default swaps ("CDS");

- Whole loan residential mortgages sourced through primary originators, mortgage conduits and the secondary market;

- Senior secured loans to middle market companies, or middle market loans, and senior secured loans to larger companies that are more broadly syndicated senior secured loans;

- Tranches of asset-backed securities ("ABS"), including collateralized debt obligations ("CDO") or collateralized loan obligations ("CLO") collateralized by residential or commercial mortgage loans or home equity loans, either directly or indirectly through CDS; and

- Leveraged finance instruments, including, but not limited to, high yield corporate bonds, distressed debt securities and corporate mezzanine loans and other investments, including private and public equity investments.

### 2. *Employees*.

Because the Debtors were managed by the Manager, the Debtors do not have any (and have never had any) full or part time employees.

## B. Corporate History and Structure

2008 AHC was formed as a Maryland corporation in May 2005. 2008 AHC completed a private offering of the Common Stock and the Convertible Notes in July 2005.

2008 AHC presently has one direct qualified REIT subsidiary known as QRS, which was formed to invest in real estate and non-real estate assets, including securities held upon securitization of residential mortgage loans. In addition, 2008 AHC has a taxable REIT subsidiary, known as TRS, which was formed to hold investments in CDOs and other non-real estate assets.

The following chart illustrates the organizational structure of the Debtors affiliates:



## C. Management of the Debtors

When active, the day-to-day business operations of the Debtors were administered by the Manager pursuant to that certain management agreement dated as of August 7, 2006. In addition, the Manager was responsible for determining investment criteria, sourcing, analyzing and executing investments, asset sales and financings, performing asset management duties and providing finance, accounting and administrative services. The Manager also entered into an agreement with Institutional Credit Partners, LLC to act as an advisor on certain ABS CDO's managed by the Manager, including the Debtors'.

2008 AHC is obligated to pay the Manager the following fees (subject to performance benchmarks) and expense reimbursements:

i.  <u>Base Management Fee</u>:  A quarterly fee paid in arrears in cash in an amount equal to one quarter (1/4) of 2008 AHC's equity times 1.75%, subject to certain performance benchmarks detailed in the management agreement.  For the year ending December 31, 2008 and for the first half of 2009, 2008 AHC has not paid any base management fees.

ii.  <u>Incentive Management Fee</u>:  A quarterly fee equal to 25% of the amount by which 2008 AHC's net income per share for such quarter exceeds certain formula-based performance benchmarks detailed in the management agreement.  For the year ending December 31, 2008 and for the first half of 2009, 2008 AHC has not paid any incentive management fees.

iii.  <u>Expense Reimbursement</u>:  The Manager is entitled to reimbursement of expenses incurred by the Manager, including a prorated portion of the compensation of the chief financial officer, legal, accounting, due diligence and other services.  For the quarter ending September 30, 2008, 2008 AHC paid $288,387.00 in reimbursement expenses incurred in 2008.  2008 AHC did not pay any reimbursement expenses for the fourth quarter of 2008 and the first half of 2009.  Approximately $301,956.00 was due and owing to the Manager in reimbursement expenses as of the Petition Date.  The Manager, as part of the negotiations with the Creditors' Committee and as consideration for the releases provided herein, agreed to waive its Claim for reimbursement expenses.[1]  The Debtors have paid the Manager a flat fee of $7,000.00 per month postpetition to complete the wind down of the Debtors' businesses.  The Manager typically incurs reimbursement expenses of approximately $150,978.00 per quarter.

The Debtors do not have any employees.  The executive officers and directors are as follows:

| Name | Age | Title | Other Affiliation |
|------|-----|-------|-------------------|
| Edward S. Steffelin | 39 | Chairman of the Board of Directors, President, Chief Executive Officer, Treasurer, Chief Financial Officer and Director | Managing Director of Institutional Credit Partners LLC |
| David L. Goret | 45 | Vice-President, General Counsel and Secretary | General Counsel of GSC Group |

## D.  <u>Summary of Prepetition Indebtedness</u>

At the Petition Date, the Debtors' total consolidated debt was approximately $112 million.  The Debtors' prepetition unsecured debt structure is comprised mainly of the Convertible Notes Claims.  The Debtors have no secured debt.

### 1.  *The Convertible Unsecured Notes Due 2010.*

On July 11, 2005, 2008 AHC issued $97.9 million in Convertible Notes.  Interest on the Convertible Notes is due on a semiannual basis (each January 15th and July 15th). The Convertible Notes were to mature on July 15, 2010.

---

[1]  The Manager's and GSC Group, Inc.'s waiver of the reimbursement Claim in the amount of $301,956.00 does not constitute a waiver of any other Claims held by the Manager and GSC Group, Inc.

**E.     Summary of Investment Portfolio and Assets**

      *1.     The Debtors' Investment Portfolio.*

2008 AHC's investment portfolio as of the Petition Date consisted of the following whole loan hybrid mortgages and mezzanine notes. With respect to the whole loan mortgages, 2008 AHC (through QRS) completed the securitization of certain mortgages, and retained certain residual interest securities in the transaction, as follows:

- GSCCC Mort. Trust 2006-1 M4 issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-1. As of June 2009, GSCCC Mort. Trust 2006-1 M4 has no expected liquidation value.

- GSCCC Mort. Trust 2006-1 M3 issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-1. As of June 2009, GSCCC Mort. Trust 2006-1 M3 has a notional value of $2,180,402.00, and no expected liquidation value.

- GSCCC Mort. Trust 2006-1 M2 issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-1. As of June 2009, GSCCC Mort. Trust 2006-1 M2 has a notional value of $2,168,000.00, and no expected liquidation value.

- GSCCC Mort. Trust 2006-1 B1 issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-1. As of June 2009, GSCCC Mort. Trust 2006-1 B1 has no expected liquidation value.

- GSCCC Mort. Trust 2006-2 B1 issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-2. As of June 2009, GSCCC Mort. Trust 2006-2 B1 has no expected liquidation value.

- GSCCC Mort. Trust 2006-1 C issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-1. As of June 2009, GSCCC Mort. Trust 2006-1 C has a notional value of $1,951,314.00, and no expected liquidation value.

- GSCCC Mort. Trust 2006-2 C issued by special purpose vehicle GSC Capital Corp. Mortgage Trust 2006-2. As of June 2009, GSCCC Mort. Trust 2006-2 C has a notional value of $2,709,650.25, and no expected liquidation value.

As of June 1, 2009, the Debtors' whole loan mortgage securities did not have any expected liquidation value and create phantom income. On August 26, 2009, the Debtors were authorized to abandon their interests in these securities pursuant to section 554 of the Bankruptcy Code (Dkt. No. 71).

In addition, as of the Petition Date, 2008 AHC (through QRS) held $15,000,000 in aggregate principal amount of mezzanine notes identified as CRNMZ 07-3A A2B, and issued by special purpose vehicle CRNMZ Mezzanine ABS CDO III. As of June 1, 2009, CRNMZ 07-3A A2B had an estimated liquidation value of zero. On August 26, 2009, the Debtors were authorized to abandon their interests in the mezzanine notes pursuant to section 554 of the Bankruptcy Code (Dkt. No. 71).

      *2.     Assets-Cash on Hand.*

As of June 15, 2009, the Debtors had $2,717,223.73 in cash on hand, which consisted of $13,536.88 held by 2008 AHC, $31,891.03 held by TRS, and $2,671,795.82 held by QRS.

3.    *Assets-Other.*

The only assets (other than cash on hand) of 2008 AHC are its equity interests in QRS and TRS, and a TRS intercompany note receivable in the approximate amount of $43 million. Since the Debtors have no active or operating businesses, the Debtors do not believe these assets have any value.

## F.    Events Leading to the Commencement of these Chapter 11 Cases

1.    *The Company Could Not Make Scheduled Payments.*

2008 AHC is currently in default on the Convertible Notes. The terms of the Convertible Notes Indenture provide, among other things, that if 2008 AHC failed to consummate a qualifying initial public offering on or before January 15, 2008, 2008 AHC was required to pay the Convertible Noteholders a payment equal to 4% of the principal amount of the Convertible Notes on January 15, 2008. The initial public offering did not take place and 2008 AHC did not make the 4% payment under the Convertible Notes Indenture. The Convertible Notes Indenture also provides that interest on the Convertible Notes is due semi-annually on July 15 and January 15. 2008 AHC has not made any interest payments on the Convertible Notes since January 2008.

2.    *Deteriorating Market Conditions.*

As is well known, the last several years have been extremely challenging both for the originators and the investors in mortgage loans. Beginning in 2007, the U.S. capital markets deteriorated significantly due to rising subprime residential mortgage defaults and the deterioration in value of certain complex residential mortgage-backed securities. This in turn caused credit-rating agencies to downgrade the credit ratings on securities backed by large pools of home mortgages. With the lower ratings came discounted mortgage-backed security valuations, which put tremendous downward pressure on the markets as investors were forced to sell these securities in order to meet margin calls based on the valuation write-downs. The deterioration evolved into a virtual shutdown of commercial real estate finance markets with the failures of Fannie Mae and Freddie Mac, the government bail-out of AIG, and the bankruptcy Lehman Brothers in September 2008. The lack of credit has caused severe damage to the entire real estate sector, as illustrated by the chapter 11 filings of General Growth Properties, Inc., and, most recently, Extended Stay Inc.

The effect on the Debtors was no different. Like many other REITS, the viability of the Debtors' businesses depended on ready-access to functioning credit markets to fuel the investment strategy. The collapse of these markets made it virtually impossible for the Debtors to implement and service their investment strategy and cover massive margin calls, much less restructure and de-leverage the balance sheet outside of these Chapter 11 Cases. Combined with the default under the Convertible Notes, the necessity of these Chapter 11 Cases can be briefly summarized as follows: the Debtors recorded a net loss of $352,275,635.00 for the year ending December 31, 2008, and a net loss of $13,374,548 through March 31, 2009. Further, the unprecedented market disruptions described above have rendered the Debtors' businesses inoperable and there is virtually no hope of refinancing. The Debtors are in default under the Convertible Notes Indenture and have no source of cash to service this debt. As a result, the Debtors' management and directors, after consultation with the Convertible Noteholders Committee, strongly believed that a court-supervised wind-down of the Debtors' businesses was necessary to preserve and maximize value for creditors.

*Pre-Bankruptcy Restructuring Negotiations.*

The Debtors' boards of directors authorized senior management, along with the Debtors' advisors, to negotiate with its principal creditor group in order to conduct these Chapter 11 Cases in the most efficient manner possible. Negotiations with the Convertible Noteholders Committee involved consideration of a pre-arranged plan of reorganization. Since the default under the Convertible Notes Indenture, the parties engaged in numerous discussions and negotiations regarding the terms of a potential restructuring and plan of reorganization or disposition of remaining assets. Members of the Convertible Noteholders Committee were appointed to the Creditors' Committee, which supports the Plan. As a result, it is contemplated that the Plan will be a consensual arrangement among the Debtors and their principal creditors, which is intended to promptly maximize value for all constituents.

## ARTICLE V
## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that, for the Bankruptcy Court to confirm the Plan as a consensual plan, the Holders of Impaired Claims against the Debtors in each Class of Impaired Claims must accept the Plan by the requisite majorities set forth in the Bankruptcy Code. An Impaired Class of Claims shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Claims in such Class actually voting on the Plan have voted to accept it and (b) more than one-half in number of the Holders in such Class actually voting on the Plan have voted to accept it (such votes, the "Requisite Acceptances").

In light of the significant benefits to be attained by the Debtors' creditors pursuant to consummation of the transactions contemplated by the Debtors' liquidating Plan, the Debtors' boards of directors recommend that all Holders of Claims in those Classes entitled to vote accept the Plan. The boards of directors have reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' assets, creditors, and shareholders. These alternatives include liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors' boards of directors determined, after consulting with financial and legal advisors, that the Plan would result in a more favorable distribution to creditors as opposed to a chapter 7 liquidation strategy. The fees and expenses incurred in a chapter 7 liquidation would likely double and substantial delays would likely occur as a result of new professionals having to familiarize themselves with the assets and liabilities of the Debtors. The Debtors' businesses and investments were complex. The Debtors maintain that liquidating in the Chapter 11 Cases utilizing the Manager and other professionals, including Creditors' Committee counsel familiarity and historical knowledge, will maximize distributions to creditors. For these reasons, the Debtors' boards of directors support the Plan and urge the Holders of Claims entitled to vote on the Plan to accept and support it.

## ARTICLE VI
## THE PLAN

A.     <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization (or liquidation) is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor and any creditor or equity interest holder of a debtor.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property, if any, that each class is to receive under the plan and (iii) contains other provisions necessary to the reorganization or liquidation of the debtor and required or permitted by the Bankruptcy Code.

Pursuant to section 1125(b) of the Bankruptcy Code, the solicitation of votes must be preceded by "a written disclosure statement approved, after notice and a hearing, by a court as containing adequate information" as defined in section 1125(a). Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy applicable disclosure requirements, the Debtors are submitting this Disclosure Statement to holders of Claims who are Impaired and not deemed to have rejected the Plan.

## B.  Overview of the Plan

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Plan places the various Claims (other than those that do not need to be classified) into one Class and segregates the Interests into one Class. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims -- Claims that are not in dispute, are not contingent, are liquidated in amount and are not subject to objection or estimation -- are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Disputed Claim becomes an Allowed Claim, distributions of Cash, Excess Cash, and/or other instruments or property otherwise available to the Holder of such Claim will not be made.

The Plan is intended to enable the Debtors to complete an orderly wind-down of their businesses and, thereby, to maximize all stakeholders' returns through fair and equitable recoveries.

The Confirmation Date is the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date is the first Business Day on or after the Confirmation Date on

which all of the conditions to the Effective Date specified in Article 9.2 of the Plan are satisfied or waived and the parties consummate the transactions contemplated by the Plan.

The Debtors anticipate that the Effective Date will occur during [_____] 2009. Such date could be delayed should there be a delay in entry of the Confirmation Order. Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

## C.    **Unclassified Claims**

### *1.    Administrative Claims Generally (Not Impaired)*

Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Claim shall be paid by the Disbursing Agent, at their election, (i) in full, in Cash, in such amounts as are incurred in the ordinary course of business by the Debtors, or in such amounts as such Administrative Claim is determined to be an Allowed Administrative Claim by the Bankruptcy Court upon the later of the Effective Date or the date upon which there is a Final Order allowing such Administrative Claim; (ii) upon such other terms as may exist in the ordinary course of such Debtor's business; or (iii) upon such other terms as may be agreed upon in writing between the Holder of such Administrative Claim and the Debtors, in each case in full satisfaction, settlement, discharge and release of, and in exchange for, such Administrative Claim. All outstanding fees payable to the U.S. Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date shall be paid by the Disbursing Agent no later than thirty (30) days after the Effective Date.

### (a)    *Professional Fee Claims.*

Professionals asserting a Professional Fee Claim (other than substantial contribution Claims) for services rendered before the Effective Date must File and serve on the Debtors and such other entities designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Claim no later than thirty (30) days after the Effective Date; provided, however, that any Professional who may receive compensation or reimbursement of expenses as an ordinary course Professional may continue to receive such compensation and reimbursement for expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the ordinary course Professionals order (if any). Objections to any Professional Fee Claim must be Filed and served on the Debtors and the requesting party no later than thirty (30) days after the filing of the applicable request for payment of the Professional Fee Claim. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Professional Fee Claims. The Debtors shall pay in full Allowed Professional Fee Claims.

### (b)    *Fee Estimate.*

Professionals asserting a Professional Fee Claim pursuant to sections 326, 327, 328, 330, 503(b)(2) through (6) and/or 1103 of the Bankruptcy Code shall File a Fee Estimate. The Debtors will be under no obligation to reserve funds sufficient to pay Professional Fee Claims once Allowed if a Fee Estimate is not Filed by such Professional seeking payment, and under no obligation to make distributions on Allowed Professional Fee Claims for which a Fee Estimate is not timely filed.

     (c)  *Effect of Failure to Timely File Claims, Requests for Payment or Objections.*

    Any Holder of a Professional Fee Claim or substantial contribution Claim who does not timely File a Claim, Fee Estimate or request for payment of such Claim is enjoined from proceeding against Debtors, and from receiving any distributions under the Plan. Objections to Professional Fee Claims or substantial contribution Claims must be Filed and served on the requesting party no later than thirty (30) days after the Filing of the request for payment of a Professional Fee Claim or substantial contribution Claim. Objections not Filed within this time shall be deemed waived.

     2.  *Tax Claims (Not Impaired)*

    The legal, equitable and contractual rights of the Holders of Tax Claims are unaltered by the Plan. On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Tax Claim is an Allowed Tax Claim as of the Effective Date or (ii) the date on which such Tax Claim becomes an Allowed Tax Claim, the Debtors, in their sole discretion, shall instruct the Disbursing Agent to pay to each Holder of an Allowed Tax Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Tax Claim (A) Cash equal to the amount of such Allowed Tax Claim; (B) such other less favorable treatment as to which the applicable Debtor or Disbursing Agent and the Holder of such Allowed Tax Claim shall have agreed upon in writing; or (C) such other treatment such that the Allowed Tax Claim will not be Impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Allowed Tax Claims incurred by the applicable Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the applicable Debtor or Disbursing Agent without further notice to or order of the Bankruptcy Court. The Disbursing Agent may prepay any Allowed Tax Claim at any time after the Effective Date without penalty or charge. Holders of Allowed Tax Claims will not be entitled to receive any payment on account of any penalties arising with respect to, or in connection with, such Claims. Any Claim for any such penalty will be deemed disallowed by confirmation of the Plan.

**D.**  **Description of the Classes**

     *1.*  *Class 1:  Secured Claims.*

    Class 1 consists of Secured Claims. The Debtors do not believe that they have any Holders of Allowed Secured Claims.

     *2.*  *Class 2:  General Unsecured Claims (Impaired)*

    On or prior to the Initial Distribution Date, the Disbursing Agent shall distribute a Pro Rata share of Excess Cash to each Holder of an Allowed Claim in Class 2. On or prior to the Subsequent Distribution Date(s), the Disbursing Agent shall distribute a Pro Rata share of any Excess Cash of the Debtors from any source, including, without limitation, Excess Reserves, proceeds from Causes of Action and proceeds from the liquidation of all Assets (if any) of the Debtors, to Holders of Allowed Claims in Class 2 pursuant to Article 6.1(c) of the Plan. Distributions made to Allowed Claims in Class 2 on the Initial Distribution Date and/or the Subsequent Distribution Date(s) (if any), shall be in full satisfaction, settlement, discharge and release of and in exchange for, Allowed Claims in Class 2.

3.     *Class 3:  Existing Equity Holders and Cobalt Litigation Claims (Impaired)*

On the Effective Date, each of the Existing Equity Holders and each of the Holders of Cobalt Litigation Claims will not receive a recovery under the Plan and their respective interests shall be deemed cancelled, null and void and of no force and effect without further act or action under any applicable law, regulation, order, rule or agreement.

Pursuant to section 510(b) of the Bankruptcy Code, claims for damages arising from the purchase or sale of a security are subordinated, except that if such security is common stock, such claim has the same priority as common stock.  Accordingly, the Cobalt Litigation Claims are subordinated to general unsecured creditors and classified with Existing Equity Holders in Class 3.

**E.     Other Provisions of the Plan**

1.     *Liquidation Fund*

The Plan is to be implemented consistent with section 1123 of the Bankruptcy Code.  On the Effective Date or as soon thereafter as practicable, all Assets of the Estates will be transferred to the Liquidation Fund to pay all amounts due under the Plan, to be paid by the Disbursing Agent in order of priority as set forth herein.

2.     *Rights, Powers and Duties of the Disbursing Agent*

The specific rights, powers and duties of the Disbursing Agent are detailed in <u>Article 5.6</u> of the Plan.

3.     *Reserve Account*

Unless otherwise stated in the Confirmation Order, on the Effective Date or as soon thereafter as practicable, after consultation with the Debtors and the Creditors' Committee, the Disbursing Agent shall establish an interest-bearing Reserve Account from the proceeds of the Liquidation Fund for such estimated amounts as may be needed to, *inter alia*, pay the costs and expenses of winding down the Estates' affairs including, but not limited to, the retention of Professionals pursuant to <u>Article 6.4</u> of the Plan and expenses relating to the prosecution and resolution of Rejection Claims or Disputed Claims (if any).

4.     *Notice of the Effective Date*

On the Effective Date, the Debtors shall File notice that the Effective Date has occurred and provide such notice to the Convertible Notes Indenture Trustee by e-mail.

5.     *Limited Consolidation of the Debtors for Voting and Distribution is not necessary.*

All Impaired Claims and Interests of the Debtors are located at 2008 AHC, and not at TRS or QRS.  Therefore, the substantive consolidation of the Debtors for voting, confirmation, distribution purposes is not necessary.  The IRS is the only creditor of TRS and its Claims are unimpaired.  QRS has no creditors.

6.     *Timing and Conditions of Distributions*

(a)     Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions from the Liquidation Fund to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article 8 of the Plan. No payments or other distributions shall be made on account of any Claim to the extent it is not an Allowed Claim.

On or prior to the Initial Distribution Date, all Excess Cash of the Debtors or the Liquidation Fund shall be distributed Pro Rata by the Disbursing Agent to Holders of Allowed Claims.

Subsequent to the Initial Distribution Date, any Cash from any source of the Debtors or the Liquidation Fund, including, without limitation, Excess Cash, Excess Reserves, proceeds from Causes of Action and all proceeds of the liquidation of all Assets (if any) of the Debtors, shall be distributed Pro Rata by the Disbursing Agent to Holders of Allowed Claims twice annually (such Subsequent Distribution Dates shall occur each year on December 15th and June 15th or such other date established by the Disbursing Agent with the Creditors' Committee Consent), subject to the Reserve Account pursuant to Articles 5.7 and 6.4 of the Plan, expenses pursuant Article 12.17 of the Plan and reserves pursuant to Article 8.3 of the Plan.

(b)     Payment of the Convertible Notes Indenture Trustee Fees

The Disbursing Agent shall pay the Convertible Notes Indenture Trustee Fee Claim in Cash on or as soon as practicable after the Effective Date but in any event, no later than the Initial Distribution Date. The Convertible Notes Indenture Trustee shall also be entitled to payment of reasonable fees and expenses, including legal fees, incurred after the Effective Date in connection with the implementation of this Plan. The Convertible Notes Indenture Trustee shall file a Fee Estimate on or before five calendar days before the Effective Date. The Bankruptcy Court will retain jurisdiction to determine the reasonableness of any such fees.

(c)     No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on or after the Petition Date on any Allowed Claim.

(d)     Distributions by the Disbursing Agent

Other than as specifically set forth below, the Disbursing Agent shall make all distributions required to be distributed under Article 6.4 the Plan. Distributions on account of Convertible Notes Claims shall be made to the Convertible Notes Indenture Trustee. The Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan.

(e)    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

(i)    Delivery of Distributions in General. Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001.

(ii)    Undeliverable and Unclaimed Distributions.

(A)    Holding of Undeliverable and Unclaimed Distributions. If the distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address.

(B)    After Distributions Become Deliverable. The Disbursing Agent shall make all distributions that have become deliverable or have been claimed since the Initial Distribution Date as soon as practicable after such distribution has become deliverable or has been claimed.

(C)    Failure to Claim Undeliverable Distributions. Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through or on behalf of such Holder) that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within six months after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any such Cash shall become part of the Liquidation Fund and distributed in accordance with the provisions of the Plan. Nothing contained in the Plan shall require the Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(f)    <u>Record Date for Distributions</u>

The Disbursing Agent or the Debtors will have no obligation to recognize the transfer of, or the sale of participation in, any Allowed Claim (except Convertible Notes Claims) that occurs after the close of business on the Distribution Record Date and any Convertible Notes Claim that occurs after the Effective Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (except Convertible Notes Claims) who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, and, with respect to Convertible Notes Claims, or participants therein, after the Effective Date. The Disbursing Agent or the Debtors shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register, or their books and records, as of the close of business on the Distribution Record Date.

(g)     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

(h)     Means of Cash Payment

Payments of Cash or Excess Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Debtors or the Disbursing Agent, by (a) checks drawn on, or (b) wire transfers from, a domestic bank selected by the Disbursing Agent. Cash payments to foreign creditors may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(i)     Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Debtors or Disbursing Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions thereunder shall be subject to any such withholding and reporting requirements. The Debtors or Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, (i) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Debtors or Disbursing Agent for the payment and satisfaction of such tax obligations. Any Cash, Excess Cash and/or other consideration or property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Article 6.5 of the Plan.

(j)     Setoffs

The Debtors or the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off against (i) any Allowed Claim, (ii) the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, or (iii) claims of any nature whatsoever that the Debtors or the Disbursing Agent may have against the Holder of such Allowed Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Disbursing Agent of any such claim that the Debtors or Disbursing Agent may have against such Holder.

(k)     Surrender of Convertible Notes

On or as soon as practicable after the Effective Date, the Convertible Notes Indenture Trustee shall coordinate with the Depository Trust Company to surrender and cancel the original global note, and no further surrender or cancellation of the Convertible Notes shall be required.

7.      *Resolution of Disputed Claims*

*Rejection Claims.* Holders of Rejection Claims must file proofs of Claims on or before the Bar Date. No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court), the Debtors or Disbursing Agent, as the case may be, may file objections to such Claims with the Bankruptcy Court and serve such objections upon the Holders of such Claims to which objections are made. Nothing contained herein, however, shall limit the Debtors' or Disbursing Agent's right to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Debtors or the Disbursing Agent shall be authorized to, and shall, resolve all Rejection Claims by withdrawing or settling such objections thereto, or by litigating to Final Order in the Bankruptcy Court, the validity, nature, and/or amount thereof.

*All Other Claims.* The amount set forth in the Schedules shall constitute the amount of the Allowed Claim of any creditor that did not timely and properly File a proof of Claim with the Bankruptcy Court by the Bar Date. If the Claim is a Disputed Claim, the Debtors will attempt to resolve any such disputes consensually or through judicial or non-judicial means outside the Bankruptcy Court (and no further Bankruptcy Court order shall be required in connection with such resolutions). Nevertheless, the Debtors may, in their discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto. All such objections will be litigated to Final Order; provided, however, that the Debtors may compromise and settle, withdraw or resolve by any other method, any objection to Claims without further order of the Bankruptcy Court. Any objections to Disputed Claims will be Filed, if necessary, by the Claims Objection Deadline.

(a)     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim, except if there is any dispute as to any portion of the Convertible Notes Claim filed by the Convertible Notes Indenture Trustee, distributions shall be made on such claim as part of the distributions made on the Initial Distribution Date and, if any, Subsequent Distribution Date(s), based on an Allowed Claim of $111,790,760 as set forth in the Plan, until the dispute regarding such claim is resolved.

(b)     Reserves for Disputed Claims

Except to the extent the Bankruptcy Court shall determine that a lesser amount is adequate, the Debtors or the Disbursing Agent shall deposit in the Reserve Account Cash equal to the distributions that would have been made to Holders of Disputed Claims in such Class or category if such Claims were Allowed Claims.

All interest and earnings on funds deposited in the Reserve Account shall be held in trust in the Reserve Account and shall be distributed only in the manner described in the Plan.

At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the distributions reserved for such Disputed Claim or such portion (including interest) shall be released from the Reserve Account and distributed on the Initial Distribution Date or Subsequent Distribution Date(s) (or such other date as determined by the Disbursing Agent in its sole discretion but subject to Article 8.2

of the Plan) by the Disbursing Agent to the Holder of such Allowed Claim, net of any taxes or other applicable charges required to be paid by the Disbursing Agent in respect thereof.  At such time as all or any portion of any Disputed Claim is determined not to be an Allowed Claim, the distribution reserved for such Disputed Claim or such portion (including interest) shall be released from the Reserve Account and shall be held by the Disbursing Agent as an excess reserve ("Excess Reserve(s)").

(c)    <u>Excess Reserves</u>

All Excess Reserves arising from the Reserve Account shall be transferred by Disbursing Agent to the Liquidation Fund, and shall thereafter be distributed in accordance with the terms of this Plan.

Prior to the Initial Distribution Date, the Debtors, in consultation with the Creditors' Committee, shall reserve funds from the distribution to be made on the Initial Distribution Date to provide for future distributions on Disputed Claims, Professional Fees (accruing prior and subsequent to the Effective Date) and other expenses to be paid from the funds of the Debtors' Estates.

8.    <i>Treatment of Executory Contracts</i>

Section 365 of the Bankruptcy Code affords the Debtors the power to assume or reject, subject to Bankruptcy Court approval, executory contracts.  The Debtors' treatment of executory contracts is set forth below.

(a)    <u>Assumption of Executory Contracts and Unexpired Leases</u>

On the Effective Date, all Executory Contracts of the Debtors will be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, <u>except</u> those Executory Contracts that (i) have been assumed by order of the Bankruptcy Court, (ii) are the subject of a motion to assume pending on the Effective Date, (iii) are identified on <u>Exhibit A</u> to the Plan (which <u>Exhibit A</u> may be amended by the Debtors to add or remove Executory Contracts by filing with the Bankruptcy Court an amended <u>Exhibit A</u> and serving it on the affected contract parties at any time on or prior to five (5) days prior to the deadline set by the Bankruptcy Court for Filing objections to confirmation of the Plan) or (iv) are rejected pursuant to the terms of the Plan.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

(b)    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

All Rejection Claims with respect to Claims arising from or in connection with the rejection of Executory Contracts, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection or within thirty (30) days after the date of entry of the Confirmation Order. Any Rejection Claims not filed within such time will be forever barred from assertion against the Debtors or their Estates or property.

9.      *Releases and Injunctions Related to Releases*

(a)      Releases by the Debtors.

On the Effective Date, the Debtors, in their individual capacities and as debtors in possession, and the Estates, release all the Released Parties, and their respective Professionals and property, from any and all Claims (including Causes of Action) and potential Claims, whether for tort, fraud, contract, or otherwise, whether known or unknown, foreseen or unforeseen, existing or thereafter arising, based in whole or in part upon any act or omission, transaction, or other occurrence taking place on or before the Confirmation Date, in any way relating to the Chapter 11 Cases or the Plan, including, but not limited to, the negotiation, solicitation, confirmation and consummation of the Plan; provided, however, that nothing shall release (A) any person from any claims, obligations, rights Causes of Action, or liabilities based upon any act or omission in connection with, relating to, or arising out of, the (i) Chapter 11 Cases, (ii) solicitation of acceptances of the Plan, (iii) pursuit of confirmation of the Plan, (iv) consummation of the Plan, (v) administration of the Plan, or (vi) property to be distributed under the Plan, if such act or omission related to (i) through (vi) arises out of such person's gross negligence or willful misconduct or to the extent applicable, such person's breach of fiduciary duty, and (B) any Released Parties, their Professionals and their respective property with respect to Causes of Action related to transactions, acts and omissions unrelated to the Debtors either pre- or postpetition, in their individual capacities and as debtors in possession, and the Estates or unrelated to the Chapter 11 cases.

(b)      Third Party Release.

Each Person who (i) is entitled to receive a distribution under the Plan or pursuant to the Plan (whether or not a distribution has been made) or (ii) is a member of a Class that votes to accept this Plan (or is deemed to accept this Plan), whether or not such member has voted to accept the Plan, shall be deemed a "Releasing Party." By virtue of Bankruptcy Code sections 1126(c) and 1141(a), each Releasing Party shall be deemed to have released for itself and its respective Professionals, in each case in their capacity as such, any and all Claims and Causes of Action against the Released Parties (as applicable), and their respective Professionals and their respective property, arising prior to the Effective Date. Nothing in the previous sentence shall be deemed to release (AA) the Debtors, in their individual capacities and as debtors in possession, and the Estates from liability for (i) Claims properly and timely filed before the applicable Bar Dates, including the Administrative Claims Bar Date, and (ii) Claims scheduled by the Debtors that are not contingent, disputed or unliquidated; provided, however, that, notwithstanding clause (i) above, the Debtors may object to the allowance of any Claim on any ground; and (BB) any Released Parties, their Professionals and their respective property with respect to Causes of Action related to transactions, acts and omissions unrelated to the Debtors either pre- or postpetition, in their individual capacities and as debtors in possession, and the Estates or unrelated to the Chapter 11 Cases.

Each party to which this section of the Plan applies shall be deemed to have granted the releases set forth herein notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation.

(c)     Exculpation and Limitation of Liability.

Pursuant to section 1125(e) of the Bankruptcy Code, the Released Parties, and their respective Professionals (collectively, the "Plan Participants"), will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11 Cases including, but not limited to the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit of Causes of Action, or any other act taken or omitted to be taken in connection with the Plan, the Disclosure Statement, or the Confirmation Order, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that any Plan Participant could incur liability as a result of any such act or omission to the extent that such act or omission constitutes fraud, gross negligence or willful misconduct or willful violation of federal or state securities laws or the IRC.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any Plan Participant, whether directly, derivatively, on account of or respecting any claim, debt, right, or Cause of Action based in whole or in part upon any Exculpated Conduct. Any Plan Participant injured by any willful violation of the injunctions provided in the Plan shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

(d)     Injunction

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, in their individual capacities and as debtors in possession, and/or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Released Parties, or any of their respective Professionals Persons or any of their respective property with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Released Parties, or any of their Professionals or any of their respective property with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Released Parties, or any of their respective Professionals or any of their respective property with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Released Parties or any of their respective Related Persons or any of their property with respect to any such Claim or Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this section shall prohibit the Holder of a timely-filed Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the claimant of any of the obligations of the Debtors under this Plan.

The foregoing releases are justified as an integral part of the Debtors' overall restructuring and liquidation efforts. The Released Parties have all made substantial contributions to the Estates; indeed, without such contributions the Debtors could not have proposed a confirmable Plan. Put simply, the Debtors' proposed Plan represents demonstrably unique circumstances.

The non-Debtor Released Parties (and their respective Related Persons) include the Manager (GSCP (NJ), L.P.) and GSC Group, Inc. The Manager, together with certain affiliates, does business as GSC Group, Inc. Each of the Manager and GSC Group, Inc. have performed vital roles in the negotiation of the proposed Plan, and have agreed to make substantial contributions to the Estates. Specifically, the Manager and GSC Group, Inc. have negotiated with the Debtors' principal creditors for over a year in order to wind down the Debtors' businesses in the most efficient manner possible and present a confirmable Plan. Critical to these efforts was the waiver of $301,956.00 in reimbursement expenses by the Manager and GSC Group, Inc., and the agreement by the Manager to complete the post-petition wind down of the Debtors at a flat fee of $7,000.00 per month. The Manager typically incurs reimbursement expenses of approximately $150,978.00 per quarter. The Manager and GSC Group, Inc. would not have agreed to make their respective substantial financing contributions in the absence of the proposed releases.

The Released Parties also include the Convertible Noteholders Committee, which refers to the informal prepetition committee of Convertible Noteholders.[2] The Convertible Noteholders Committee extensively negotiated with the Debtors, their financial advisors and attorneys for over a year in connection with out-of-court efforts to restructure the Debtors' businesses. The professionals representing the Convertible Noteholders were compensated by the Debtors, but neither the individual members of the Convertible Noteholders Committee nor any of their affiliates were compensated. The individual representatives from the entities (and/or their affiliates) owning Convertible Notes expended numerous hours working through various restructuring scenarios that ultimately proved unsuccessful as a result of the severe economic downturn. The Debtors firmly believe that the prepetition services of the Convertible Noteholders Committee (including their affiliates and their professionals) paved the way for these consensual Chapter 11 Cases to be conducted in an efficient and equitable manner, thereby increasing recoveries for the entire creditor body as well as saving valuable time and Bankruptcy Court resources. Accordingly, the service of the Convertible Noteholders Committee constitutes good and valuable consideration in exchange for the proposed releases. In addition, the inclusion of Deutsche Bank Securities Inc. as a released party in respect of any prepetition services to the Debtors would benefit the Debtors and the entire creditor body by reducing or eliminating the Debtors' obligations under an indemnity granted in its favor by the Debtors. In other words, a release would, in turn, limit potential Claims against the Debtors.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases, and further, will constitute its finding that the releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the Claims released by the releases; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any Claim released by the releases against any of the Released Parties.

### 10.    *Cancellation of Notes, Instruments, Debentures and Common Stock*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (i) the Convertible Notes and any other notes, bonds, indentures or other instruments or documents evidencing

---

[2]    The Convertible Noteholders Committee consisted of (i) U.S. Bank National Association, Convertible Notes Indenture Trustee (ex-officio member), (ii) Tempo Master Fund LP, (iii) DKR SoundShore Oasis Holdings Fund, Ltd., (iv) Glenview Capital Management LLC, (v) Deutsche Bank AG London and (vi) D.E. Shaw Valence Portfolios, L.L.C.

or creating any indebtedness or obligations of a Debtor shall be cancelled and extinguished, (ii) the obligations of the Debtors under any agreements, documents, indentures or certificates of designation governing the Convertible Notes and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that are Impaired under this Plan shall be, and are hereby, discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Disbursing Agent or by any other Person, and (iii) the Common Stock shall be canceled (and all securities convertible or exercisable for or evidencing any other right in or with respect to the Common Stock) without any conversion thereof or distribution with respect thereto. Notwithstanding the foregoing or any other contrary term or provision provided in the Plan, the Convertible Notes Indenture shall continue in effect solely for the purposes of: (i) maintaining all of the protections the Convertible Notes Indenture Trustee enjoys as against the Convertible Noteholders to receive distributions under this, including its lien rights with respect to any Plan distributions; and (ii) allowing and preserving the rights of the Convertible Notes Indenture Trustee to make distributions in satisfaction of Allowed Convertible Notes Claims, but in all cases subject to the terms and conditions of the Convertible Notes Indenture. As of the Effective Date, the Convertible Notes shall be surrendered to the Convertible Notes Indenture Trustee in accordance with the terms of the Convertible Notes Indenture. All surrendered and canceled Convertible Notes held by the Convertible Notes Indenture Trustee shall be disposed of in accordance with the applicable terms and conditions of the Convertible Notes Indenture.

## F. Conditions Precedent to the Effective Date

### 1. Conditions Precedent

Each of the following is a condition precedent to the occurrence of the Effective Date:

(a) The Effective Date shall have occurred on or before December 15, 2009.

(b) The Confirmation Order confirming the Plan, as such Plan may have been amended or modified, in form and substance reasonably satisfactory to the Debtors, shall have been entered and docketed by the Bankruptcy Court, and such order shall have become a Final Order and shall provide that:

(i) the Debtors or the Disbursing Agent are authorized to take all actions necessary or appropriate to enter into, implement, and consummate (as applicable) the contracts, instruments, releases, leases, indentures and other agreements or documents contemplated by or described in the Plan;

(ii) the provisions of the Confirmation Order are non-severable and mutually dependent; and

(iii) the Debtors and their Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125 and 1126(b) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

(c)  All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required under the Plan or the Confirmation Order, filed with the applicable governmental authorities in accordance with applicable laws.

### 2.  *Waiver of Conditions*

Each of the conditions set forth in Article 9.2 of the Plan may be waived in whole or in part by the Debtors or Disbursing Agent, upon Creditors' Committee Consent, without notice to other parties in interest or notice to or order of the Bankruptcy Court and without a hearing. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtors or Disbursing Agent regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of a Debtor or Disbursing Agent to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

### 3.  *Consequences of Non-Occurrence of Effective Date*

If the Effective Date does not occur within 30 days after the Confirmation Date, or by such later date, after notice and hearing, as is proposed by the Debtors given in writing or on the record in these Chapter 11 Cases, then upon motion by the Debtors or the Creditors' Committee and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Article 9.4 of the Plan, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume, assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated; provided that the Debtors retain their rights to seek further extensions of such deadline in accordance with, and subject to, section 365 of the Bankruptcy Code.

## G.  **Effect of Confirmation**

### 1.  *Binding Effect*

On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon and inure to the benefit of the Debtors. The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

### 2.  *Severability of Plan Provisions*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or

interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## H.     Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under and/or related to these Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(d)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(e)     Resolve disputes arising from the Creditors' Committee asserting its rights under Articles 5.3(b) and 5.6 of the Plan;

(f)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, including, without limitation, any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code;

(j)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k)     Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(n)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with these Chapter 11 Cases;

(o)     Hear and determine all matters related to the property of the Estates from and after the Confirmation Date;

(p)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(q)     To enter a Final Decree closing these Chapter 11 Cases.

Prior to the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters over which it may exercise jurisdiction pursuant to 28 U.S.C. § 1334.

## I.     Bar Dates for Administrative Claims

To the extent necessary, the Confirmation Order will establish a Bar Date (expected to be 10 days after the Confirmation Date) for filing Administrative Claims (the "Administrative Claims Bar Date"). Holders of alleged Administrative Claims not paid prior to the Confirmation Date shall File motions requesting payment of such Claims on or before such Administrative Claims Bar Date or forever be barred from doing so (unless such alleged Administrative Claim is incurred in the ordinary course of business by the Debtors and is not yet past-due, in which case the applicable Administrative Claims Bar Date shall be thirty (30) days after such due date or as otherwise ordered by the Bankruptcy Court). The notice of Confirmation to be delivered pursuant to Bankruptcy Rule 3020(c) and 2002(f) will set forth such date and constitute notice of this Administrative Claims Bar Date. The Debtors or the Disbursing Agent shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and File objections to such

Administrative Claims, if necessary, and the Bankruptcy Court shall hear and determine the amount of such Administrative Claims.

## J. Modifications and Amendments

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

## K. Plan Revocation, Withdrawal or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, except as otherwise provided by the Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, (if any), and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtors or any other Person or Entity, or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

## L. Cobalt Litigation

The Cobalt Litigation means that certain action by Cobalt Management, Inc. and certain affiliates ("Cobalt") against GSC Capital Corp. (n/k/a 2008 AHC), GSCP (NJ), L.P. and GSC Group, Inc., alleging (i) breach of an offering memorandum and registration rights agreement against all three defendants in connection with a June 2005 private placement of equity interests, (ii) fraud by GSC Group based on alleged oral misrepresentations, and (iii) breach of an oral agreement by GSC Group regarding the registration statement. On January 23, 2009, all claims against GSCP (NJ), L.P. and GSC Group, Inc. were dismissed on various grounds, and Cobalt appealed (pending). The action against 2008 AHC is stayed by virtue of the Chapter 11 Cases.

The Cobalt Litigation Claims have the same priority in these Chapter 11 Cases as the Existing Equity Holders pursuant to section 510(b) of the Bankruptcy Code. Specifically, in the Cobalt Litigation, Cobalt seeks to either rescind its purchase of equity interests in 2008 AHC or recover damages for the alleged breach of the offering memorandum and registration rights agreement. Since Cobalt's claims arise from the purchase or sale of a security in 2008 AHC, such claims have the same priority as common stock, and are subordinated to the claims of general unsecured creditors under section 510(b).

## M. Preservation of Causes of Action

Except as provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any Claims, rights or Causes of Action that the Debtors

may have under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' Estates. The Disbursing Agent, with the Creditor's Committee Consent, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights and Causes of Action without Bankruptcy Court approval, and all proceeds of such actions shall be transferred to the Liquidation Fund, provided however, that the Disbursing Agent shall not be required to pre-pay, advance or front any fees and/or expenses on behalf of the Estates in connection with or related to carrying out any of the Disbursing Agent's rights, duties and obligations under the Plan, including but not limited to all such rights, duties and obligations under Article 5.6 and Article 10.7 of the Plan; provided however, that the Creditors' Committee may with the consent of the Disbursing Agent, which consent shall not be unreasonably withheld, institute, prosecute, abandon, settle or compromise any and all such Claims, rights and Causes of Action under Article 10.7 of the Plan in the event the Debtors and/or Disbursing Agent decline to do so.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.

**N.      Corporate Dissolution**

Immediately after the Effective Date, the president of the Debtors shall be authorized to take, in his sole discretion, all actions necessary to dissolve the Debtors under applicable laws, including paying all reasonable fees and expenses in connection with such dissolution.

**O.      Dissolution and Rights of Creditors' Committee**

The Creditors' Committee appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code shall be dissolved on the date that is 18 months subsequent to the Effective Date unless extended by the Creditors' Committee with the consent of the Debtors (which will not be unreasonably withheld).

Following the date of entry of the Confirmation Order, the U.S. Trustee shall not have responsibility for or oversight of the Creditors' Committee, including any modifications to the membership of the Creditors' Committee. Post-confirmation, the Creditors' Committee shall have the right to modify the composition of the committee including, without limitation, the right to replace a member of the Creditors' Committee that resigns.

Subsequent to the Effective Date, the rights of the Creditors' Committee shall include, without limitation, the right to (a) contest any action taken by the Disbursing Agent or the Debtors without Creditors' Committee Consent, and (b) take any other action that is in the reasonable best interests of the Holders of General Unsecured Claims including actions to enforce the provisions of the Plan.

**P.**     **Entry of a Final Decree**

Promptly following the completion of all distributions contemplated by the Plan, the Debtors or Disbursing Agent will file a motion with the Bankruptcy Court to obtain the entry of a Final Decree.

**Q.**     **Nondischarge of the Debtors**

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Claims. However, no Person holding a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan. As of the Confirmation Date, all Persons are precluded from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**R.**     **Fees and Expenses**

From and after the Effective Date, the Disbursing Agent shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred, including those fees and expenses incurred in connection with the implementation and consummation of the Plan, provided, however, that management fees with respect to GSCP (NJ), L.P. shall not exceed $7,000 per month for a period not to exceed the date that is the earlier or (i) the completion of distributions under the Plan or (ii) eighteen (18) months following the Petition Date. From and after the Effective Date, the Disbursing Agent shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of the professionals retained by the Creditors' Committee pursuant to section 1103 of the Bankruptcy Code that accrue subsequent to the Effective Date, provided, however, that such reasonable fees and expenses shall not exceed, in aggregate, $30,000.00. If such fees and expenses exceed $30,000.00, and the Creditors' Committee and the Debtors do not consent to the payment of such excess fees and expenses, the Professionals seeking payment shall obtain Bankruptcy Court approval for such excess amounts.

## ARTICLE VII
## CONFIRMATION OF THE PLAN OF LIQUIDATION

**A.**     **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization / liquidation. The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the hearing on confirmation or any subsequent adjourned or continued hearing on confirmation.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon (i) O'Melveny & Myers LLP,

counsel for the Debtors, 7 Times Square, New York, NY 10036, Attn.: Shannon Lowry Nagle, Esq.; (ii) The Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attn.: Andy Velez-Rivera, Esq.; (iii) Hogan & Hartson LLP, counsel for the Creditors' Committee, 875 Third Avenue, New York, NY 10022, Attn.: Ira S. Greene, Esq.; and (iv) Maslon Edelman Borman & Brand, LLP, counsel for the Convertible Notes Indenture Trustee, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, Attn.: Brian Klein, Esq.

Rule 9014 of the Federal Rules of Bankruptcy Procedure governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.**     <u>**Confirmation**</u>

At the hearing on confirmation of the Plan, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and is not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the Holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date;

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cram down" of Classes deemed to reject the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith. Set forth below is a summary of the relevant statutory confirmation requirements.

*1.*    *Acceptance*

Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

*2.*    *Unfair Discrimination and Fair and Equitable Test*

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors (if any), unsecured creditors and holders of equity interests, which are as follows:

- Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- General Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such claims and equity interests.

- Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such interest.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### 3. Feasibility; Projections; Valuation

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a chapter 11 plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the chapter 11 plan. The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed to creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Estates will no longer exist to be subject to future reorganization or liquidation.

### 4. Best Interests Test

The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Allowed Claims than liquidation under chapter 7. Specifically, with respect to each impaired Class of Claims, confirmation of the Plan requires that each Holder of a Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties (if any) in the context of a liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by (i) first, the costs and expenses of liquidation and such additional administrative claims that might result from the use of chapter 7 for the purposes of liquidation, (ii) second, the Debtors' costs of liquidation under chapter 7, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Debtors' Chapter 11 Cases, including the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is greater than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7.

The Debtors prepared a liquidation analysis which is annexed hereto as Exhibit 3. The information set forth in Exhibit 3 provides (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates and (b) the expected recoveries of the Debtors' creditors under the Plan. The Debtors' liquidation analysis indicates that Holders of Administrative Claims and Tax Claims, would, after payment of liquidation costs and expenses, receive a 100% recovery on their Claims in a liquidation scenario. Such Holders would also receive 100% under the Plan. As reflected in Exhibit 3, the Holders of General Unsecured Claims would have an estimated recovery of 0.5% to 1.1% on their Claims in a liquidation, and an estimated recovery of 1.3% to 1.4% on their Claims under the Plan.

Underlying the Debtors' liquidation analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Debtors' liquidation analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Debtors' liquidation analysis is based in connection with their evaluation of the Plan.

## C.  Classification of Claims and Interests

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code.

## D.  Consummation

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in the Plan, have been satisfied or waived pursuant to the Plan. For a more detailed discussion of the conditions precedent to the Plan and the consequences of the failure to meet such conditions, see Article VI.

The Plan is to be implemented pursuant to its terms and consistent with the provisions of the Bankruptcy Code.

## ARTICLE VIII
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors will remain unable to service their obligations under the Convertible Notes Indenture or to cure the current defaults thereunder. In addition, the Debtors will simply run out of cash. The Debtors do not have sufficient income-generating investments to pay taxes generated by the retention of certain assets, and to continue the employment of the Manager and other professionals to manage the Debtors and/or comply with tax regulations. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

## A.  Liquidation Under Chapter 7

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of the effect a chapter 7 liquidation would have on the recoveries of the Holders of Claims is set forth in Article VII of this Disclosure Statement.

## B.  Alternative Plan(s) of Liquidation

In formulating and developing the Plan, the Debtors explored numerous other alternatives and extensively negotiated with the Convertible Noteholders, the principal creditor group in these Chapter 11 Cases.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims and enable the Holders of Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## C.     Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation. Most significantly, the Convertible Notes, already in default, would be subject to enforcement in accordance with the Convertible Notes Indenture. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a viable alternative to the Plan.

## ARTICLE IX
## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all Exhibits hereto, together with the related materials included herewith, are being furnished to the Holders of Claims in Class 2, the only Class entitled to vote on the Plan. Notice of Filing the Plan and Disclosure Statement will be provided to Holders of Claims and Interests in Class 3 and known Holders of Administrative and Tax Claims.

All votes to accept or reject the Plan must be cast by using the ballot (the "Ballot") enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed [October 7, 2009] at 5:00 p.m. (Eastern time) (the "Voting Record Date") as the date for the determination of holders of record of Claims entitled to receive a copy of this Disclosure Statement and the related materials and to vote to accept or reject the Plan. Ballots must be RECEIVED by Counsel for the Debtors no later than 5:00 p.m. (Eastern time) on [November 6, 2009], unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice (in either case, the "Voting Deadline").

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to counsel for the Debtors.

# ARTICLE X
## CERTAIN FACTORS TO BE CONSIDERED

### A.    Certain Bankruptcy Considerations

    *1.    Bankruptcy Matters*

      (a)    General

Although the Plan is designed to satisfy certain Claims against the Estates in full, and, thereby, to minimize the length of these bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure that the Plan will be confirmed.

      (b)    Failure to Receive Requisite Acceptances

If the Requisite Acceptances are received, the Debtors intend to seek, as promptly thereafter as practicable, confirmation of the Plan. If the Requisite Acceptances are not received, the Debtors may seek to accomplish an alternative restructuring of their obligations to creditors. There can be no assurance that the terms of any such alternative arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

      (c)    Failure to Confirm the Plan

Even if the Requisite Acceptances are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (unless such liquidation is contemplated) and that the value of distributions to dissenting Holders of Claims may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

      (d)    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. Under the Plan, the Effective Date must occur within 30 days of the date of the Confirmation Order. Moreover, if each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before December 15, 2009, or such later date as may be consented to by the parties, the Bankruptcy Court may vacate the Confirmation Order, in which event the Plan would be deemed null and void.

      (e)    Debtors Could Withdraw the Plan

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

Conversion into a Chapter 7 Case

If a liquidating plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, the chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and a liquidation analysis are set forth in Article VII herein.

## B.    Risks Relating to Tax and Accounting Consequences of the Plan

### 1.    *Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations*

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.*

## ARTICLE XI
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

TO COMPLY WITH INTERNATIONAL REVENUE SERVICES CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    Federal Income Tax Consequences to the Debtors

### 1.    *Cancellation of Indebtedness*

The Debtors generally should realize cancellation of indebtedness ("COD") income to the extent the sum of the fair market value of any property is less than the sum of (x) the adjusted issue prices of the discharged debt, (y) the adjusted issue price of any other debt exchanged for property pursuant to the Plan and (z) the amount of any unpaid accrued interest on the discharged debt. There are not expected to be

any debt for property exchanges under the Plan. The Debtors previously qualified as a real estate investment trust under the Internal Revenue Code of 1986, as amended ("IRC"). The Debtors expect to maintain qualification as real estate investment trust for both the 2008 and 2009 taxable years. Although final taxable income amounts for 2008 and 2009 will not be known until filing, The Debtors do not expect to have taxable income for either year that would require a distribution to shareholders in order to maintain such qualification as a real estate investment trust.

Under IRC Section 108, COD income realized by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD income realized as a result of the implementation of the Plan.

Under IRC Section 108(b), a debtor that does not recognize COD income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include net operating losses ("NOLs"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stocks of subsidiaries). However, since the Debtors are not going to be continuing operations and will wind up their businesses and liquidate, the affect on tax attributes of the Debtors from the Bankruptcy Exception should not affect the Holders or the Debtors.

For tax periods through the 2007 tax year, the Debtors reported on federal income tax returns approximately $5.7 million of NOLs and NOL carryforwards and approximately $5.1 million of NOLs and NOL carryforwards for purposes of the alternative minimum tax ("AMT NOLs"). The Debtors believe that for federal income tax purposes, the Debtors' generated approximately $13.7 million of consolidated NOLs and AMT NOLs in the 2008 tax year preceding the Effective Date. However, the actual amount of the Debtors' 2008 and 2009 NOLs and AMT NOLs will not be determined until the Debtors prepare their federal income tax returns for such periods. Moreover, the Debtors' NOLs and AMT NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs and AMT NOLs ultimately may vary from the amounts set forth above.

2.    *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("ACE"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of its AMTI generally may be offset by available AMT NOL carryforwards.

**B.** **Federal Income Tax Consequences to Holders of Certain Claims**

    1.    *Holders of General Unsecured Claims*

        (a)    Repayment of Convertible Notes

Holders should consult their tax advisors regarding the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the Convertible Notes constitute a capital asset in the Holder's hands, whether the Convertible Notes have been held for more than one year, whether the Convertible Notes have bond premium or market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the Convertible Notes. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains or losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

    2.    *Other Considerations*

*Accrued Interest.* To the extent a Holder of Convertible Notes receives consideration that is attributable to unpaid accrued interest on the notes, the Holder may be required to treat such consideration as a payment of interest. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid interest. The Debtors or the Disbursing Agent intend to take the position that cash or property distributed pursuant to the Plan will first be allocable to the principal amount of the Holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDER SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

*Market Discount.* A Holder will be considered to have acquired a Convertible Note at a market discount if its tax basis in the note immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, subject to a statutorily-defined *de minimis* exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the Holder's election, under a constant yield method. A Holder that acquired a Convertible Note at a market discount previously may have elected to include the market discount in income as it accrued over the term of the note.

A Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the Holder. However, special rules apply to the disposition of a market discount obligation is certain types of non-recognition transactions, such as a recapitalization. Rather, on a subsequent taxable disposition of the stock or securities received in the exchange, any gain realized by the Holder on a disposition of the stock or securities will be ordinary income to extent of the market discount accrued on the Convertible Note prior to the exchange that is allocable to the stock or securities, and any gain realized by the Holder on a disposition of the stock or securities will be ordinary income to extent of the allocable amount of market discount accrued on the stock or securities after the exchange. The method of allocating accrued market discount to stock and securities when both are received in exchange for a market discount obligation in a recapitalization is

uncertain. Accordingly, Holders that acquired the Convertible Notes with market discount should consult their tax advisors regarding this issue.

*Amortizable Bond Premium.* If a Holder's initial tax basis in a Convertible Note was greater than the sum of all amounts payable on the note (other than payments of qualified stated interest) after the acquisition date, the Holder generally will be considered to have acquired the note with amortizable bond premium. A Holder that acquired a Convertible Note at a premium previously may have elected to amortize the premium over the term of the note under the rules described above. A Holder that elected to amortize bond premium on a Convertible Note should have reduced its tax basis in the note by the amount of amortized bond premium used to offset interest income and may, in certain circumstances, be entitled to a deduction for any unamortized bond premium in the taxable year of the exchange.

3.    *Information Reporting and Backup Withholding*

The Debtors or the Disbursing Agent may be obligated to furnish information to the IRS regarding the consideration received by Holders (other than corporations and other exempt Holders) pursuant to the Plan.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors or the Disbursing Agent its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

# ARTICLE XII
## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to Holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce if not eliminate any return to any creditors who hold Impaired Claims. The Debtors urge the Holders of Impaired Claims in Class 2 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to counsel for the Debtors so that they will be received not later than 5:00 p.m., prevailing Eastern Time, on [November 6, 2009].

Dated: October 6, 2009

Respectfully submitted,

2008 ASSET HOLDING CORP.
2008 ASSET HOLDING -- QRSRE CORP.
2008 ASSET HOLDING -- TRS CORP.

By: /s/ Edward Steffelin
Name: Edward Steffelin
Title: President

## Exhibits

- Plan (<u>Exhibit 1</u>) [Filed Separately];

- Consolidated financial statements (unaudited) for the Debtors as of June 30, 2009 (<u>Exhibit 2</u>) [to be provided];

- The Debtors' Liquidation Analysis (<u>Exhibit 3</u>) [to be provided];